## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------x
                              :
JULIA R. HARPER               :    Civ. No. 3:16CV01168(SALM)
                              :
                              :
v.                            :
                              :    July 20, 2017
NANCY A. BERRYHILL,           :
ACTING COMMISSIONER OF        :
SOCIAL SECURITY               :
                              :
------------------------------x
```

### RULING ON CROSS MOTIONS

Plaintiff Julia R. Harper ("plaintiff"), an adult aged 47, brings this appeal under §205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. §405(g), seeking review of a final decision by the Commissioner of the Social Security Administration (the "Commissioner" or "defendant") denying her application for Supplemental Security Income ("SSI") under the Act and for Adult Child's Insurance Benefits ("CIB") based on disability. Plaintiff has moved to reverse the decision of the Commissioner, or in the alternative, for remand. [Doc. #19].

For the reasons set forth below, plaintiff's Motion to Reverse the Decision of the Commissioner [Doc. #19] is **DENIED**, and defendant's Motion to Affirm the Decision of the Commissioner [Doc. #21] is **GRANTED**.

## I.   **PROCEDURAL HISTORY**

Plaintiff filed concurrent applications for SSI, CIB, and Disability Insurance Benefits ("DIB") on January 10, 2013, alleging disability beginning January 1, 1986. See Certified Transcript of the Administrative Record, compiled on August 24, 2016, (hereinafter "Tr.") 449-465. Plaintiff's applications were denied initially on April 4, 2013, see Tr. 87-140, 186, 189, and upon reconsideration on September 24, 2013. See Tr. 144-179.[1]

On July 20, 2015, plaintiff, accompanied and represented by attorney Ivan Katz, appeared and testified at a hearing before Administrative Law Judge ("ALJ") Ronald J. Thomas. See Tr. 46-85. Vocational Expert ("VE") Warren D. Maxim testified at the hearing by telephone. See Tr. 74-85. On September 17, 2015, the ALJ issued an unfavorable decision. See Tr. 14-30. On May 17, 2016, the Appeals Council denied plaintiff's request for review,

---

[1] The administrative record contains the administrative denial of plaintiff's SSI application and plaintiff's CIB claim, but does not include a determination of plaintiff's DIB claim. See Tr. 186-205. Further, the DIB claim was not addressed in the ALJ's decision. Plaintiff points out this omission, and states: "It is assumed that the Disability Insurance Benefits application was denied on the basis that Ms. Harper had never acquired enough quarters of coverage to qualify for benefits under Title II, which is assuredly the case." Doc. #19-1 at 2 n.2 (citation omitted). Plaintiff has not raised any argument in regards to the DIB claim. The Court therefore considers any argument regarding plaintiff's DIB claim waived. See Vilardi v. Astrue, 447 F. App'x 271, 272 n.2 (2d Cir. 2012) (issues not raised on appeal deemed waived); see also Stanton v. Astrue, 370 F. App'x 231, 233 (2d Cir. 2010) ("[Plaintiff] did not complain of any omission in her various objections to the district court. Accordingly, we deem the argument waived." (footnote omitted)).

thereby making the ALJ's September 17, 2015, decision the final decision of the Commissioner. <u>See</u> Tr. 1-4. The case is now ripe for review under 42 U.S.C. §405(g).

Plaintiff filed this timely action for review and moves to reverse the Commissioner's decision, or to remand for a new hearing. [Doc. #19]. On appeal, plaintiff argues:

1.  The ALJ erred at step two of the analysis;

2.  The ALJ erred by failing to develop the administrative record and by failing to fill a gap in the administrative record;

3.  The ALJ's Residual Functional Capacity ("RFC") determination is not supported by substantial evidence;

4.  The ALJ erred in evaluating the evidence; and

5.  The ALJ's step five analysis is not supported by substantial evidence.

As set forth below, the Court finds that the ALJ did not err as contended by plaintiff, and that the ALJ's determination is supported by substantial evidence.

## II.  <u>STANDARD OF REVIEW</u>

The review of a social security disability determination involves two levels of inquiry. <u>First</u>, the Court must decide whether the Commissioner applied the correct legal principles in making the determination. <u>Second</u>, the Court must decide whether

the determination is supported by substantial evidence. <u>See</u> <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). The reviewing court's responsibility is to ensure that a claim has been fairly evaluated by the ALJ. <u>See</u> <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983) (citation omitted).

The Court does not reach the second stage of review – evaluating whether substantial evidence supports the ALJ's conclusion – if the Court determines that the ALJ failed to apply the law correctly. <u>See</u> <u>Norman v. Astrue</u>, 912 F. Supp. 2d 33, 70 (S.D.N.Y. 2012) ("The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." (citing <u>Tejada v. Apfel</u>, 167 F.3d 770, 773-74 (2d Cir. 1999))). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made

4

according to the correct legal principles." <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) (alterations added) (citing <u>Treadwell v. Schweiker</u>, 698 F.2d 137, 142 (2d Cir. 1983)). The ALJ is free to accept or reject the testimony of any witness, but a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." <u>Williams ex rel. Williams v. Bowen</u>, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing <u>Carroll v. Sec. Health and Human Servs.</u>, 705 F.2d 638, 643 (2d Cir. 1983)). "Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding." <u>Johnston v. Colvin</u>, No. 3:13CV00073(JCH), 2014 WL 1304715, at *6 (D. Conn. Mar. 31, 2014) (citing <u>Peoples v. Shalala</u>, No. 92CV4113, 1994 WL 621922, at *4 (N.D. Ill. Nov. 4, 1994)).

It is important to note that in reviewing the ALJ's decision, this Court's role is not to start from scratch. "In reviewing a final decision of the SSA, this Court is limited to

determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009)).

## III. **SSA LEGAL STANDARD**

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. §423(a)(1).

To be considered disabled under the Act and therefore entitled to benefits, plaintiff must demonstrate that she is unable to work after a date specified "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Such impairment or impairments must be "of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §416.920(c) (requiring that the impairment "significantly limit[] ... physical or mental ability to do basic work activities" to be considered "severe").

The SSA "provides disability insurance benefits for a disabled adult child on the earnings record of an insured person who is entitled to old-age or disability benefits or who has died if the claimant is 18 years old or older and has a disability that began before the claimant became 22 years old." Doerr v. Colvin, No. 13CV429(JTC), 2014 WL 4057446, at *3 (W.D.N.Y. Aug. 14, 2014) (quotation marks and citations omitted). See 42 U.S.C. §402(d)(1)(G); 20 C.F.R. §404.350(a)(5). See also Vella v. Astrue, 634 F. Supp. 2d 410, 417 (S.D.N.Y. 2009) ("Disabled adult child disability benefits are available if such child was under a disability (as so defined) at the time [s]he attained the age of 18 or if [s]he was not under such a disability (as so defined) at such time but was under a disability (as so defined) at or prior to the time [s]he attained (or would attain) the age of 22." (quotation marks and citations omitted)), aff'd sub nom., Vella v. Comm'r of Soc. Sec., 394 F. App'x 755 (2d Cir. 2010). "In the context of determining eligibility for disabled adult child's benefits, the term 'disability' has substantially the same definition as it does in traditional, adult disability cases." Doerr, 2014 WL 4057446, at *3 (citation omitted).

There is a familiar five-step analysis used to determine if a person is disabled. See 20 C.F.R. §416.920. This process applies to cases in which a claimant applies for child's

7

benefits after she reaches the age of 18. See Trombley v. Colvin, No. 8:15CV00567(TWD), 2016 WL 5394723, at *2 n.3 (N.D.N.Y. Sept. 27, 2016) ("In determining eligibility for disabled [adult] child's benefits... the five-step sequential process is applicable." (citation omitted)); see also Gagnon v. Comm'r of Soc. Sec., No. 7:14CV1194(GLS), 2016 WL 482068, at *1 (N.D.N.Y. Feb. 5, 2016) ("The regulations under 42 U.S.C. §405(g) govern both disability insurance benefits (DIB) and child's insurance benefits (CIB)." (citation omitted)).

In the Second Circuit, the test is described as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). If and only if the claimant does not have a listed impairment, the Commissioner engages in the fourth and fifth steps:

> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the

claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of proof as to the first four steps, while the Secretary must prove the final one.

Id.

"Through the fourth step, the claimant carries the burdens of production and persuasion, but if the analysis proceeds to the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform given his residual functional capacity." Gonzalez ex rel. Guzman v. Dep't of Health and Human Serv., 360 F. App'x 240, 243 (2d Cir. 2010) (citing 68 Fed. Reg. 51155 (Aug. 26, 2003) (alteration added)); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam)). The RFC is what a person is still capable of doing despite limitations resulting from his physical and mental impairments. See 20 C.F.R. §416.945(a)(1).

"In assessing disability, factors to be considered are (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978). "[E]ligibility for benefits is to be determined in light of the fact that 'the Social Security Act is a remedial statute to be

broadly construed and liberally applied.'" Id. (quoting Haberman
v. Finch, 418 F.2d 664, 667 (2d Cir. 1969)).

## IV.   **THE ALJ'S DECISION**

Following the above-described five-step evaluation process,
ALJ Thomas concluded that plaintiff was not disabled prior to
the date she attained age 22, and was not disabled from the SSI
application date through the date of the ALJ's decision. See Tr.
18, 29. For plaintiff's CIB claim, the ALJ first determined that
plaintiff attained age 22 on December 5, 1991. See id. at 20. At
step one, the ALJ found that plaintiff had not engaged in
substantial gainful activity from the alleged onset date of 1986
through December 5, 1991. See id. At step two, the ALJ did not
find evidence of a severe impairment prior to December 5, 1991.
See id.

For plaintiff's SSI application, at step one, the ALJ found
that plaintiff had not engaged in substantial gainful activity
since January 1, 2013, the SSI application date. See id. At step
two, as of January 1, 2013, the ALJ found that plaintiff had the
severe impairments of a right rotator cuff tear with
impingement; lumbago; diabetes mellitus; obesity; and bipolar
disorder. See id. The ALJ also found that plaintiff suffered
from a substance abuse disorder that was not severe during the
period in question, and that plaintiff's HIV was also not a
severe impairment. See id. at 21.

10

At step three, the ALJ found that plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. See Tr. 21. The ALJ specifically considered Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), and 12.04 (affective disorders). See id.

Before proceeding to step four, the ALJ found plaintiff has the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she is limited to occasional overhead reaching with the master arm; occasional bending, twisting, squatting, kneeling, crawling, climbing and balancing. She is further limited to occasional interaction with supervisors, the public, and co-workers. She is capable of sustaining routine, simple, repetitious tasks that do not require teamwork or working closely with the public.

Tr. 23. At step four, the ALJ found that plaintiff had no past relevant work. See id. at 27. At step five, after considering plaintiff's age, education, work experience and RFC, as well as the testimony of the VE, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform. See id. at 28-29.

## V.    DISCUSSION

On appeal, plaintiff raises five arguments in support of reversal or remand. The Court will address each one in turn.

**A.    Step Two**

Plaintiff contends that the ALJ erred at step two of the sequential analysis by making no finding as to the severity of plaintiff's PTSD diagnosis, and by failing to properly evaluate plaintiff's mental health as a whole. See Doc. #19-2 at 8-15. Defendant argues that the ALJ considered plaintiff's PTSD in determining plaintiff's RFC, so that even if the ALJ erred as plaintiff contends, it is not a basis for remand. See Doc. #21-1 at 10-11. Defendant further contends that the ALJ properly considered and evaluated plaintiff's mental impairments. See id. at 11-12.

At step two, as to the CIB claim, the ALJ did not find any evidence of a severe impairment prior to the date plaintiff attained age 22. See Tr. 20. The ALJ then determined that, as of the SSI application date, plaintiff suffered from the following severe impairments: right rotator cuff tear with impingement; lumbago; diabetes mellitus; obesity; and bipolar disorder. See id. The ALJ also found plaintiff's HIV and substance abuse disorder to be non-severe impairments. See id. The ALJ made no finding regarding plaintiff's PTSD.

A step two determination requires the ALJ to determine the medical severity of the plaintiff's impairments. See 20 C.F.R. §§404.1520(a)(4)(ii), 416.920(a)(4)(ii); see also id. at (c). At this step, the plaintiff carries the burden of establishing that

12

she is disabled, and must provide the evidence necessary to make
determinations as to her disability. <u>See</u> 20 C.F.R.
§§404.1512(a), 416.912(a). An impairment "is considered 'severe'
if it significantly limits an individual's physical or mental
abilities to do basic work activities[.]" Social Security Ruling
("SSR") 96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996). An
impairment is "not severe" if it constitutes only a "slight
abnormality (or a combination of slight abnormalities) that has
no more than a minimal effect on the ability to do basic work
activities." <u>Id.</u> (citation omitted). "The mere presence of a
disease or impairment, or establishing that a person has been
diagnosed or treated for a disease or impairment is not, itself,
sufficient to deem a condition severe." <u>McConnell v. Astrue</u>, No.
6:03CV0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)
(quotation marks and citation omitted).

   "At step two, if the ALJ finds an impairment is severe,
'the question whether the ALJ characterized any other alleged
impairment as severe or not severe is of little consequence.'"
<u>Jones-Reid v. Astrue</u>, 934 F. Supp. 2d 381, 402 (D. Conn. 2012)
(quoting <u>Pompa v. Comm'r of Soc. Sec.</u>, 73 F. App'x 801, 803 (6th
Cir. 2003)), <u>aff'd</u>, 515 F. App'x 32 (2d Cir. 2013). This is
because "[u]nder the regulations, once the ALJ determines that a
claimant has at least one severe impairment, the ALJ must
consider all impairments, severe and non-severe, in the

remaining steps." Pompa, 73 F. App'x at 803 (citing 20 C.F.R. §404.1545(e)).

Thus, where the ALJ considers the effects of all impairments at later stages of the analysis, failure to find particular conditions "severe" at step two -- or failure to evaluate them at that stage at all -- even if erroneous, constitutes harmless error. See Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. 2013) (finding any error in excluding two conditions from review at step two harmless "[b]ecause these conditions were considered during the subsequent steps" (citation omitted)); see also Rivera v. Colvin, 592 F. App'x 32, 33 (2d Cir. 2015) ("[E]ven assuming that the ALJ erred at step two, this error was harmless, as the ALJ considered both [plaintiff's] severe and non-severe impairments as he worked through the later steps."); Buck v. Colvin, No. 14CV216(WMS), 2015 WL 4112470, at *4 (W.D.N.Y. July 8, 2015) ("Any failure to list cognitive limitations as a severe impairment is rendered harmless by the ALJ's subsequent consideration of mental limitations in the RFC assessment."); Jones v. Astrue, No. 5:11CV372(GLS), 2012 WL 2206384, at *2 (N.D.N.Y. June 14, 2012) ("The omission of an impairment at step two may be deemed harmless error, particularly where the disability analysis continues and the ALJ later considers the impairment in his residual functional capacity (RFC) determination.").

14

Here, after finding more than one severe impairment at step two, the ALJ proceeded with the sequential evaluation, during which all impairments were considered. The ALJ considered the nature and extent of plaintiff's bipolar disorder, which he found to be "severe." See Tr. 20. The ALJ explicitly assessed plaintiff's mental health throughout the sequential evaluation. See id. at 21-27. At step three, the ALJ considered plaintiff's mental impairments and found that plaintiff had a mild restriction in her activities of daily living; moderate difficulties in the area of social functioning; and moderate difficulties in regards to concentration, persistence or pace. See id. at 22. In assessing plaintiff's RFC, the ALJ specifically referenced plaintiff's "long history of depression, bipolar disorder, and traumatic events." Id. at 24 (emphasis added). The ALJ discussed plaintiff's anxiety; forgetfulness; nightmares; voices; medications; depressive episodes; difficulty getting along with others; and her GAF scores. See id. at 24-27. The ALJ also explicitly cited to exhibits that reference plaintiff's PTSD and trauma history. See Tr. 25, 26 (citing to Exhibit 7F, which mentions PTSD at Tr. 707); Tr. 22, 25, 26 (citing to Exhibit 9F, which mentions PTSD at Tr. 753-755); see also Tr. 22, 25 (citing to Exhibit 6F, which mentions childhood abuse at Tr. 691). The ALJ's opinion further reflects that he considered "all symptoms" and that he considered plaintiff's

15

mental impairments "singly and in combination." Id. at 21, 23.
Accordingly, even if the ALJ erred as plaintiff contends, any
such error would be harmless, and would not support a reversal
of the Commissioner's decision. See Stanton v. Astrue, 370 Fed.
App'x 231, 233 n.1 (2d Cir. 2010); Rivera, 592 F. App'x at 33.

Further, plaintiff fails to develop any argument as to how
plaintiff's PTSD –- or any other mental impairment from which
plaintiff suffers -- amounts to a medically determinable severe
impairment. Indeed, plaintiff states that she cannot say how
PTSD impacts her functioning. See Doc. #19-2 at 8. Thus, any
failure by the ALJ to consider such other impairments would be
harmless, and any argument that other mental impairments should
have been found severe at step two is waived, due to the lack of
argument by plaintiff. See, e.g., Vilardi, 447 F. App'x at 272
n.2 (issues not raised on appeal deemed waived).

Accordingly, the Court finds that the ALJ did not err as
contended by plaintiff at step two of the sequential analysis.

B.   **The Administrative Record**

Plaintiff argues that the administrative record is
incomplete because it does not include a particular treating
clinician's records, and because it does not contain a medical
source statement or medical opinion from a treating clinician as
to plaintiff's functional limitations. As a result of these
gaps, plaintiff argues, the ALJ was under an obligation to

16

request additional records, evaluations, and opinions. Plaintiff contends that the ALJ's failure to do so warrants remand.

### 1.    Yale Records

Plaintiff contends that ALJ erred in failing to seek additional records to fill a gap in the administrative record. Specifically, plaintiff argues that the administrative record does not contain treatment records from APRN Lindsey Powell at Yale, despite evidence that plaintiff treated with APRN Powell; thus, plaintiff claims, the ALJ had a duty to request these records. See Doc. #19-2 at 16-17. Defendant contends that there are no obvious gaps in the administrative record that would obligate the ALJ to request additional records. See Doc. #21-1 at 5. Defendant further argues that plaintiff has not demonstrated how the records at issue would have altered the ALJ's findings. See id. at 4-5.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); see also Swiantek v. Comm'r of Soc. Sec., 588 Fed. App'x 82, 84 (2d Cir. 2015) (same). The applicable statutes and regulations require the ALJ to develop plaintiff's "complete medical history for at least the twelve-month period prior to the filing of h[er] application, [and] also to gather such information for a longer

17

period if there was reason to believe that the information was necessary to reach a decision." DeChirico v. Callahan, 134 F.3d 1177, 1184 (2d Cir. 1998); see 42 U.S.C. §423(d)(5)(B); 20 C.F.R. §416.912(b)(1).[2] "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quotation marks and citation omitted); see also Walsh v. Colvin, No. 3:13CV00687(JAM), 2016 WL 1626817, at *2 (D. Conn. Apr. 25, 2016) ("The ALJ, however, has a duty to develop the record only if the evidence before her is inadequate to determine whether the plaintiff is disabled." (quotation marks and citation omitted)).

"When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant, and plaintiff bears the burden of establishing such harmful error." Parker v. Colvin, No. 3:13CV1398(CSH), 2015 WL 928299, at *12 (D. Conn. Mar. 4, 2015) (quotation marks omitted) (collecting cases). See also Santiago v. Astrue, No. 3:10CV937(CFD), 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) ("The plaintiff in the civil action

---

[2] The application in this case was filed on January 10, 2013. Plaintiff does not contend that the record is incomplete for the 12 month period preceding that date.

must show that he was harmed by the alleged inadequacy of the record[.]" (citation omitted)).

The administrative record in this case includes treatment records from Yale New Haven Hospital, dated November 2014 through July 2015. See Tr. 761-784; 1267-1428. There are notations in these records indicating that plaintiff was receiving psychiatric care and medication through participation in a "Yale Study," Tr. 762; that she was seeing APRN Powell at Yale every week, see Tr. 1361, 1409, 1413; and that APRN Powell was prescribing psychiatric medications to plaintiff. See Tr. 1335, 1361, 1403, 1413, 1423.

The Yale New Haven Hospital treatment records also include notations regarding plaintiff's mental health and functioning during the same time that plaintiff was treating with APRN Powell. On February 12, 2015, Physician Assistant ("PA") Carol Amico at Yale New Haven Hospital noted that plaintiff was "[n]egative for dysphoric mood," and that she was "not nervous/anxious." Tr. 1348. On March 12, 2015, PA Amico noted that plaintiff had been "taking all her meds, is adherent;" "has been forgetful lately;" and had "normal mood and affect." Id. at 1361-62. On April 2, 2015, the notes indicate that plaintiff "had been feeling more manic" and that APRN Powell had increased the dosage of one of plaintiff's medications, Lamictal, that same day. Id. at 1403. An April 21, 2015, a treatment note

discusses medication changes made by APRN Powell, and also notes plaintiff's attendance at Narcotics Anonymous ("NA") meetings and supportive services. See id. at 1409. On May 26, 2015, it was noted that plaintiff was continuing on her medications and that her "mental health is stable." Id. at 1413. The same note states that plaintiff had been sober for 120 days; was attending NA meetings daily; was "doing well" in transitional housing, and "has been paying off old bills." Id. These contemporaneous treatment notes also list medications prescribed by APRN Powell at that time. See id.; Tr. 1361; 1403; 1409; 1423.

The Court is not persuaded that there is any "obvious gap" in the administrative record that would trigger an obligation on behalf of the ALJ to seek additional records. Rosa, 168 F.3d at 79 n.5. The 1,459 page record contains over eight hundred pages of treatment notes from the years preceding plaintiff's SSI application. While the record may be missing a portion of records from Yale for a period of time after her application was filed, plaintiff's mental health was still assessed and recorded during this same timeframe, and her medications and dosages were documented.

As noted, the records in question post-date plaintiff's application date. Plaintiff applied for SSI on January 10, 2013. See Tr. 449-465. Plaintiff's treatment at Yale appears to have started in or around November 2014, and proceeded through July

2015. Thus, the records in question are beyond the ALJ's duty to request. See 20 C.F.R. §416.912(b)(1).

While some courts in this Circuit have extended the ALJ's duty to develop the record through the date of the hearing, those cases are inapposite here. See, e.g., Petty v. Astrue, 582 F. Supp. 2d 434, 437 (W.D.N.Y. 2008) (extending the ALJ's duty to develop the record where there "no records of any kind" in the two-year period between the application and the hearing date); Scott v. Astrue, No. 09CV3999(KAM), 2010 WL 2736879, at *14 n.60 (E.D.N.Y. July 9, 2010) (finding that the ALJ should have sought further clarification from a treating physician, where the ALJ had "knowledge of plaintiff's changed condition between the time of his application and the time of his hearing"). Here, the record contains treatment records and objective evidence through the date of plaintiff's hearing. These records contain notes and assessments of plaintiff's mental health. There is no indication that there were any changes in plaintiff's condition during this time that would extend the ALJ's obligation.

Further, plaintiff offers no argument as to how her claim was impacted by the purportedly missing Yale records. There is no indication that such Yale records, if they exist, would have changed the ALJ's determination. Thus, plaintiff has failed to demonstrate that the purported gap in the record is significant.

See Santiago, 2011 WL 4460206, at *2 ("The plaintiff makes only a general argument that any missing records possibly could be significant, if they even exist. That argument is insufficient to carry his burden.").

Finally, "a treating source need not be re-contacted when it is known that the source either cannot or will not provide the necessary information." Stratton v. Colvin, 51 F. Supp. 3d 212, 217 (N.D.N.Y. 2014) (citing 20 C.F.R. §§404.1512(e), 416.912(e)). The ALJ's decision references the Yale records, stating: "The undersigned is confident that counsel has submitted all the Yale records he received." Tr. 26. Plaintiff affirms this statement, noting that the "ALJ's confidence is in fact well placed in that counsel submitted all documents received into the administrative record and withheld nothing whatsoever." Doc. #19-2 at 2 n.3. It appears that plaintiff requested the records from Yale and received everything Yale believed was responsive. Thus, the ALJ was under no obligation to re-contact Yale to obtain said records.

Accordingly, the Court finds that the ALJ did not err by failing to seek additional medical records from Yale.

### 2.   Medical Source Statement

Plaintiff contends that the record does not contain any assessment of plaintiff's limitations from a treating clinician, with the exception of an incomplete medical source statement

from Helen Hogan, LPC, SP, RN. See Doc. #19-2 at 2-8. Plaintiff argues that the ALJ erred by failing to obtain additional medical opinions to "determine the practical effect" of plaintiff's symptoms on her functioning. Id. at 11. Defendant argues that there is sufficient evidence in the administrative record for the ALJ to have made an informed RFC determination. See Doc. #21-1 at 6-7.

Where "the record contains sufficient evidence from which an ALJ can assess the claimant's residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8 (2d Cir. Jan. 18, 2017) (quotation marks and citations omitted); see also Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013) ("[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.").

Here, the record contains two medical source questionnaires completed by Ms. Hogan, a treating clinician. See Tr. 542-45, 687-90.[3] The ALJ afforded Ms. Hogan's opinions "no weight" for

---

[3] The first questionnaire completed by Ms. Hogan is dated January 22, 2013, see Tr. 690; the second is dated two weeks later, on February 7, 2013. See Tr. 545. The questionnaires contain the same information, and rate plaintiff the same in all areas of functioning and mood.

several reasons: the record did not contain supporting treatment notes; she is not an acceptable medical source; plaintiff had only treated with her on a few occasions; and "she was unable to answer most of the questions, which further renders [these] opinion[s] less probative." Tr. 26. On both January 22, 2013, and February 7, 2013, Ms. Hogan opined that plaintiff had no problem taking care of her personal hygiene or caring for her physical needs; a slight problem using good judgment regarding safety and handling frustration appropriately; no problem asking questions or requesting assistance; no problem respecting/responding appropriately to others in authority; no problem carrying out single-step or multi-step instructions; no problem focusing long enough to complete tasks; and a slight problem changing from one simple task to another. See id. at 688-89.

As discussed above, the administrative record also contains over 800 pages of treatment records, complete with objective evidence and treatment notes. Additionally, the record contains opinions as to plaintiff's mental limitations by state agency consultants Dr. Kelly Rogers and Dr. Katrin Carlson and opinions as to plaintiff's physical limitations by state agency consultants Dr. Firooz Golkar and Dr. Khurshid Khan. See Tr. 93-104; 159-163; 173-179. Accordingly, the Court concludes that there was sufficient evidence in the record for the ALJ to

24

determine plaintiff's RFC, and therefore the ALJ was under no obligation to obtain additional medical opinions. See Swiantek, 588 F. App'x at 84 ("Given the extensive medical record before the ALJ in this case, we hold that there were no obvious gaps that necessitate remand solely on the ground that the ALJ failed to obtain a formal opinion from one of [plaintiff's] treating physicians regarding the extent of [plaintiff's] impairments in the functional domain of caring for oneself." (quotation marks and citation omitted)).

The Court therefore determines that the ALJ did not err by failing to obtain additional medical source statements from plaintiff's treating clinicians.

### C.    The RFC Determination

Plaintiff contends that the ALJ's RFC determination was not supported by substantial evidence. Specifically, plaintiff argues that there is no evidence in the record that supports the ALJ's findings regarding plaintiff's activities of daily living, social functioning, and concentration, persistence and pace. See Doc. #19-2 at 12-13. Plaintiff further argues that her impairments prevent her from crawling, climbing and balancing. See id. at 20 n.31. In response, defendant argues that the ALJ's RFC determination is supported by substantial evidence, including the opinions of the state agency reviewers; the

evidence of record; and plaintiff's own account of her activities of daily living. See Doc. #21-1 at 8-10.

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§404.1545(a)(1), 416.945(a)(1). Although "[t]he RFC determination is reserved for the commissioner ... an ALJ's RFC assessment is a medical determination that must be based on probative evidence of record. ... Accordingly, an ALJ may not substitute his own judgment for competent medical opinion." Walker v. Astrue, No. 1:08CV00828(RJA)(JJM), 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (quoting Lewis v. Comm'r of Soc. Sec., No. 6:00CV1225(GLS), 2005 WL 1899399, at *3 (N.D.N.Y. Aug. 2, 2005) (citations omitted)).

Here, the ALJ found that plaintiff has the RFC to "perform sedentary work" that is "limited to occasional overhead reaching with the master arm; occasional bending, twisting, squatting, kneeling, crawling, climbing and balancing." Tr. 23. The ALJ further limited plaintiff to "occasional interaction with supervisors, the public, and co-workers." Id. He determined that plaintiff is "capable of sustaining routine, simple, repetitious tasks that do not require teamwork or working closely with the public." Id.

The ALJ based his assessment of plaintiff's exertional limitations on plaintiff's testimony and daily activities of

living and on the medical evidence of record, including
objective medical findings. See Tr. 23-27. The ALJ afforded
"little weight" to the state agency reviewing physician's
determination that plaintiff could perform medium work, instead
finding that plaintiff could perform only sedentary work.[4]  Tr.
26.

The medical evidence of record supports the ALJ's RFC
determination as to plaintiff's physical limitations. On January
14, 2013, an MRI report revealed a partial tear of plaintiff's
right supraspinatus tendon, with underlying impingement. See Tr.
659-60. Plaintiff subsequently exhibited reduced range of motion
and strength in her right shoulder. See Tr. 1271. Plaintiff
exhibited tenderness, swelling and spasm in her neck and
shoulder area, but also had a positive response to physical
therapy. See, e.g., Tr. 1349 (noting improving neck pain and
spasm, decreased soft tissue swelling); id. at 1360 (noting
improvement in pain in neck and shoulder with physical therapy);
id. at 1374 (noting less pain with home making activities and
independent functioning in terms of ambulation, work/leisure
activities, and daily activities); id. at 1382 (noting

---

[4] "Sedentary work involves lifting no more than 10 pounds at a
time and occasionally lifting or carrying articles like docket
files, ledgers, and small tools. ... Jobs are sedentary if
walking and standing are required occasionally and other
sedentary criteria are met." 20 C.F.R. §§404.1567(a),
416.967(a).

plaintiff's report that she no longer needs to take pain medication at home); id. at 1398 (noting no pain, but some stiffness in cervical region); id. at 1413 (noting improvement in pain from 4-6 months earlier, and intermittent pain and spasm triggered by chores). The ALJ's determination indicates that plaintiff's treatment notes were considered in determining plaintiff's exertional limitations. See Tr. 23; see also Tr. 21, 24.

Plaintiff's activities of daily living were also considered by the ALJ in determining plaintiff's physical limitations. See Tr. 24. Plaintiff testified that her limitations are "mostly mental." Tr. 52. She testified that stenosis of the neck and spine makes it difficult for her to sit, and her diabetes makes it difficult for her to stand. See id. She testified that she can stand for fifteen minutes at a time, and does not use any assistive device to walk. See id. at 55. She testified that her right arm is a "little sore" and her left arm is symptomatic. Tr. 56, 65. She further testified that she has a tingling sensation in her feet, which she experiences daily. See Tr. 56-7.

The ALJ also specifically considered plaintiff's complaints of lower back pain. See Tr. 24-5. The medical evidence of record indicates that plaintiff had experienced intermittent lower back pain since a fall in 1995. See Tr. 661. In January 2013,

plaintiff reported that the pain appeared to get worse while walking, and her symptoms were ongoing but manageable. See id. An examination revealed tenderness on palpation to the lower back. See id. at 663. However, a November 2014 treatment note indicates that plaintiff "had low back pain sleeping on hard beds ... but now better." Id. at 761. Despite her report that she was able to complete activities of daily living, the ALJ credited plaintiff's complaints of lower back pain and her "reported limitations with standing and walking" in limiting plaintiff to sedentary work. Id. at 24. The ALJ also gave "great weight" to the state agency reviewing physician Dr. Firooz Golkar's opinion that plaintiff was limited in reaching overhead with her right arm. See id. at 99-101. The Court concludes that the ALJ's RFC determination as to plaintiff's exertional limitations is supported by substantial evidence in the record.

There is also substantial evidence in the record supporting the non-exertional limitations in plaintiff's RFC. The ALJ afforded "great weight" to the state agency reviewing physician's findings as to plaintiff's non-exertional limitations and "more weight" to their findings as to plaintiff's mental limitations. Tr. 26. On March 28, 2013, after reviewing the medical evidence of record, state agency physician Dr. Kelly Rogers found plaintiff was not significantly limited in her ability to carry out short and simple instructions or

detailed instructions; to perform activities on a schedule, maintain attendance and be punctual; to sustain an ordinary routine without special supervision; and to make simple work-related decisions. See id. at 101-02. Dr. Rogers found plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted; to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. See id. Dr. Rogers found that plaintiff "remains able to repeatedly execute familiar work of at least three elements for periods of two hours or more over the course of a normal work week. She is best suited to small group settings and work without strict time/production requirements." Tr. 102.

On September 17, 2013, state agency reviewer Dr. Katrin Carlson opined that plaintiff can "sustain the mental demands needed to perform [routine repetitive tasks] for 2 hr periods in a setting [without] strict time or production demands. She can follow a set schedule and make simple work related decisions. She may be distracted more easily if working in the presence of others, so would do best in a solitary job." Tr. 176. Dr. Carlson further found that plaintiff "is able to handle

occasional, brief interactions with colleagues and can manage appropriate levels of neatness." Id.

The record reflects that the state agency reviewers considered plaintiff's activities of daily living and medical evidence of record. Dr. Rogers' opinion specifically notes consideration of a medical source evaluation from Dr. Avalos at Catholic Family Services, finding that plaintiff was "restless/anxious, cooperative, appropriate impulse control... mood dysphoric, labile ... remote memory impaired, recent memory intact, poor ability to abstract, language impaired, poor fund of knowledge ... by observation, judgment intact, insight intact, thought concrete[.]" Tr. 96. Dr. Rogers also considered the medical source questionnaire completed on January 17, 2013, by Ms. Hogan. See id. at 95-6. At the reconsideration level, Dr. Carlson considered plaintiff's more recent records from Natchuag Hospital and New Perceptions, which note plaintiff's relapse of substance abuse and non-compliance with her medications. See id. at 150. Dr. Carlson also noted her review of Ms. Hogan's medical source questionnaire. See id. Dr. Carlson noted "remarkable improvement" in plaintiff's psychiatric symptoms once plaintiff stopped abusing substances and resumed her medications. See id.

The medical evidence of record also provides support for the ALJ's RFC determination. The ALJ considered plaintiff's concentration, persistence and pace at step three, and found

that plaintiff was moderately limited in this area of functioning. See Tr. 22. In making this determination, the opinion reflects that, in addition to the medical opinion evidence, the ALJ considered plaintiff's psychiatric examinations and treatment records. See Tr. 22 (citing to Exhibit 6F, which corresponds to plaintiff's March 22, 2013, psychiatric evaluation); Tr. 25 (citing to Exhibits 12F-20F, dated from November 2004 through November 2014, which correspond to plaintiff's psychiatric treatment records for her periods of incarceration; Exhibit 7F, which corresponds to plaintiff's July 2013 treatment records, mental status examination and cognitive functioning test; and Exhibit 9F, which corresponds to plaintiff's July 19, 2013, psychiatric evaluation and treatment notes).

Further, the ALJ's decision reflects that plaintiff's reported activities of daily living were considered in the determination of plaintiff's non-exertional limitations, including plaintiff's testimony and reports that she attends daily counseling sessions; uses public transportation; shops for food and clothing; handles money; and washes and dresses herself. See Tr. 533; 536; see also Tr. 57-8; 60. Plaintiff testified that she is not comfortable in crowds. See id. at 64. She also testified that she has a short attention span, and takes medication for anxiety. See id. at 69. In determining

plaintiff's RFC, the ALJ specifically limited plaintiff's interactions with others and further limited plaintiff to "simple work," "due to a history of depressive episodes and difficulty getting along with others." Id. at 25.

The record contains substantial evidence that supports the ALJ's RFC determination, both as to plaintiff's exertional and non-exertional limitations. Accordingly, for the reasons stated above, the Court finds that the RFC assessment is supported by substantial evidence of record.

### D.    Evaluation of Evidence

#### 1.    GAF Scores

Plaintiff further argues that the ALJ erred in evaluating the evidence of record, by "refusing to consider" plaintiff's Global Assessment of Functioning ("GAF") scores. Doc. #19-2 at 14. Defendant contends that the ALJ considered and properly discounted plaintiff's GAF scores. See Doc. #21-1 at 13-14.

The ALJ's decision reflects that the various GAF scores assigned to plaintiff were considered, and assigned "little weight" because, inter alia, they "do not describe specific work related limitations or objective mental abnormalities." Tr. 26.[5]

---

[5] The ALJ stated that plaintiff's "history of incarceration, automatically lowers her GAF score, and is not a good indicator of actual functioning." Tr. 27. Plaintiff argues that this statement is unfounded. See Doc. #19-2 at 14-15. The Court could find no support for the proposition that incarceration "automatically lowers" an individual's GAF score, and the Court finds this assertion troubling. However, even if the Court

Thus, as the ALJ explicitly considered plaintiff's GAF scores, plaintiff's argument is without merit.

Further, there is substantial evidence in the record supporting the ALJ's assignment of "little weight" to plaintiff's GAF scores. The Court's review of the GAF scores assigned to plaintiff throughout the record reveals inconsistencies between the assigned GAF score and the accompanying treatment notes. See, e.g., Tr. 691-696 (assigning a GAF score of 40 but noting that plaintiff had normal/appropriate thought content; appropriate impulse control; cooperative attitude; no self-injurious intent; no aggressive behavior; was oriented to time, place and person; had intact recent memory and impaired remote memory; and intact judgment and intact insight into her psychiatric condition); id. at 1154 (assigning a GAF score of 30 while noting that plaintiff was "sad, emotional, but good behavioral control; angry about circumstances but affect modulated and approp[riate] to situation. ... logical and goal-oriented. [No] evidence of

_____

determined that the ALJ incorrectly assessed plaintiff's GAF scores due to her history of incarceration, such error would not have an impact on the ALJ's ultimate determination that plaintiff is not disabled. See Snyder v. Colvin, No. 5:13CV585(GLS)(ESH), 2014 WL 3107962, at *4 (N.D.N.Y. July 8, 2014) ("[A]dministrative legal error is harmless when the same result would have been reached had the error not occurred." (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). Accordingly, the Court declines to remand this matter on this basis.

derailment"). In at least one instance, a lower GAF score was assigned while plaintiff was abusing substances and was not compliant with her medications. See Tr. 700-03 (assigning a GAF score of 28 upon admission to hospital for suicidal ideation, but noting that plaintiff was abusing substances at the time of her admission and had not taken her medication for the two weeks prior).[6] When plaintiff restarted her medications and stopped abusing substances, her GAF score improved. See id. at 703.

Accordingly, the Court concludes plaintiff's GAF scores were considered by the ALJ, and there was substantial evidence in the record for the ALJ to assign said scores "little weight."

### 2. Mental Impairments

Plaintiff also argues that the ALJ erred in evaluating the medical evidence of record regarding plaintiff's mental impairments. Specifically, plaintiff argues that the ALJ erred in equating plaintiff's mental stability with a lack of disability. See Doc. #19-2 at 9. As discussed above, plaintiff also argues that the ALJ's determinations relative to plaintiff's social functioning, activities of daily living, and concentration, persistence and pace are unsubstantiated.

---

[6] The GAF scores in the discharge summary from Natchuag Hospital appear to be internally inconsistent. Upon admission, it was noted that plaintiff's highest GAF score that year was 45; however, upon discharge, the notes state that her highest GAF score that year was 55. Compare Tr. 702 with Tr. 703. The ALJ properly assigned the GAF scores in this discharge summary little weight. See Tr. 26.

Defendant contends that the ALJ properly considered all of the evidence, and that plaintiff "failed to establish any limitations beyond those found by the ALJ." Doc. #21-1 at 12.

In assessing plaintiff's RFC, the ALJ determined that plaintiff's symptoms were exacerbated during periods of substance abuse and when she had discontinued use of her medications. See Tr. 25. The ALJ then noted that when plaintiff "is compliant with medication and attending treatment, she has been stable." Id. The ALJ later observed that plaintiff herself "reports doing well" when she is compliant with her medications. Tr. 27.

The Court is not persuaded by plaintiff's claim that the ALJ made a determination of non-disability based on plaintiff's stability while medicated. Evidence that plaintiff's symptoms from her mental impairments remained stable or improved when she was compliant with her medications was just one factor that the ALJ considered in assessing plaintiff's credibility and determining plaintiff's RFC. The ALJ's decision reflects that he also considered plaintiff's testimony; treatment notes and psychiatric evaluations; activities of daily living; social functioning; concentration, persistence and pace; and the opinions of the state agency reviewers. There is no evidence that the ALJ relied primarily or solely on plaintiff's periods

of stability to make a determination that plaintiff was not disabled.

Further, as discussed above, the ALJ properly considered the medical evidence of record in determining the level of restriction in plaintiff's activities of daily living, social functioning, and concentration, persistence and pace. While plaintiff summarily argues that the ALJ's findings relative to plaintiff's mental health are "inexplicable," no further argument is offered as to how the ALJ's determination is erroneous in this regard. Doc. #19-2 at 12. The medical evidence of record was properly considered in assessing plaintiff's mental impairments, and the ALJ's determination regarding plaintiff's mental limitations is supported by substantial evidence of record. Accordingly, the Court finds no error.

### 3.    Neck Pain

Plaintiff also contends that the ALJ erred in disregarding plaintiff's complaints of neck pain, and in not addressing objective evidence related to pain in plaintiff's neck. See Doc. #19-2 at 19-20. Defendant argues that the ALJ considered plaintiff's neck pain, and that plaintiff failed to establish that her pain caused any limitations that would affect plaintiff's RFC. See Doc. #21-1 at 15-16.

Contrary to plaintiff's contention, the ALJ specifically considered plaintiff's neck and shoulder pain related to

plaintiff's stenosis. See Tr. 24. The ALJ explictly considered Exhibit 25F in making the RFC determination, see id., which contains multiple treatment notes discussing plaintiff's neck and shoulder pain. See, e.g., Tr. 1324, 1326, 1334, 1336, 1337, 1347, 1349, 1360, 1362. These records also include the MRI report that plaintiff contends the ALJ disregarded. See id. at 1349-50.

Additionally, the ALJ's decision references Exhibit 26F, which contains physical therapy notes for pain related to plaintiff's left arm, shoulder and neck region. See Tr. 24, see also id. at 1267-1316. The treatment notes in Exhibit 25F and 26F further indicate that the pain and spasm that plaintiff experienced in her shoulder and neck improved with physical therapy. See id. at 1360 ("Has been going to PT x 4 weeks for left shoulder pain and muscular-skeletal swelling between shoulder and neck. Has been helping, much less muscle spasm, and some less pain."); id. at 1374 ("Able to complete home making activities with less pain."); id. at 1382 ("She reports that she doesn't have to use the pain pill at home."); id. at 1389 ("She has no pain radiating down her arm at this time.").

Finally, the Court notes that plaintiff's neck pain does not appear to have been caused by one of the medically determinable impairments found by the ALJ at step two. "A RFC determination must account for limitations imposed by both

severe and nonsevere impairments." <u>Parker-Grose v. Astrue</u>, 462
F. App'x 16, 18 (2d Cir. 2012) (citations omitted); <u>see also</u>
<u>Jones-Reid</u>, 934 F. Supp. 2d at 404 ("An RFC assessment is an
individual's ability to do sustained work activities, and
considers the functional limitations supported by medically
determinable impairments."). Thus, "[o]nly functional
limitations that are the result of medically determinable
impairments are considered in the RFC assessment." <u>Waddell v.</u>
<u>Colvin</u>, No. 3:14CV00092(MAD), 2016 WL 538471, at *4 (N.D.N.Y.
Feb. 9, 2016) (citation omitted). The Regulations further
dictate: "We will consider all of your medically determinable
impairments of which we are aware, including your medically
determinable impairments that are 'not severe[]' ... when we
assess your [RFC][.]" 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

At step two, the ALJ did not find that plaintiff's neck
pain was a medically determinable impairment. Therefore, he was
not required to consider it in determining plaintiff's RFC. <u>See</u>
SSR 96-8P, 1996 WL 374184, at *2 (S.S.A. July 2, 1996) ("The Act
requires that an individual's inability to work must result from
the individual's physical or mental impairment(s). Therefore, in
assessing RFC, the adjudicator must consider only limitations
and restrictions attributable to medically determinable
impairments. <u>It is incorrect to find that an individual has</u>
<u>limitations or restrictions beyond those caused by his or her</u>

medical impairment(s) including any related symptoms, such as pain[.]" (emphasis supplied)).

Accordingly, in light of the above, the Court finds no error.

### E.    Step Five

Finally, plaintiff argues that the testimony of the Vocational Expert ("VE") is not supported by substantial evidence. In support of this claim, plaintiff challenges the VE's testimony and expertise, and argues that the evidence he presented was "conjured out of whole cloth." Doc. #19-2 at 26. Plaintiff also argues that defendant failed to meet its burden of showing that there are jobs that exist in significant numbers in the national economy that plaintiff can perform. See id. at 24-26. Defendant argues, inter alia, that the ALJ reasonably relied on the VE's testimony, and that the occupations identified do exist in significant numbers. See Doc. # 21-1 at 16-19.

After finding that plaintiff had no past relevant work, the ALJ determined that there are jobs that exist in significant numbers in the national economy that plaintiff is capable of performing. See Tr. 28. In reaching this conclusion, the ALJ adopted the VE's testimony that plaintiff "would be able to perform the requirements of representative occupations," including: (1) document preparer;  (2) surveillance system

40

monitor; and (3) inspector positions, such as a dowel inspector. Tr. 28. The VE's testimony reflects that locally, there are 1,000 document preparers; 210 surveillance system monitors; and 180 inspectors.

The Court turns first to plaintiff's contention that the jobs identified by the VE do not exist in substantial numbers in the national economy. Under the regulations, "[w]ork exists in the national economy when it exists in significant numbers either in the region where [plaintiff] live[s] or in several other regions of the country[,]" and when "there is a significant number of jobs (in one or more occupations) having requirements which [plaintiff is] able to meet with [her] physical or mental abilities and vocational qualifications." 20 C.F.R. §416.966(a),(b). The ALJ "will take administrative notice of reliable job information available from various governmental and other publications" and "may use the services of a vocational expert or other specialist" to determine whether plaintiff may work in any given occupation. 20 C.F.R. §416.966(d),(e).

"Within the Second Circuit, courts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers, but courts have adopted a relatively low threshold number." Koutrakos v. Colvin, No. 3:13CV1290(JGM), 2015 WL 1190100, at *21 (D. Conn. Mar. 16,

2015) (quotation marks and citations omitted) (collecting
cases); cf. Ramos v. Berryhill, No. 3:15CV1368(MPS), 2017 WL
838091, at *4 (D. Conn. Mar. 3, 2017) ("While courts have held
that a significant number of jobs is fairly minimal, they have
nonetheless drawn some limits." (quotation marks and citations
omitted) (collecting cases)).

Here, the VE testified that there are approximately 97,000
document preparers in the national economy and 1,000 in
Connecticut; 16,500 surveillance system monitors in the national
economy and 210 in Connecticut; and 13,000 inspector jobs
nationally and 180 in Connecticut. Without determining whether
210 surveillance system monitor positions and 180 inspector
positions would be considered significant, the Court finds that
1,000 document preparer positions does constitute a significant
number of available jobs in this region. See, e.g., Koutrakos,
2015 WL 1190100, at *22 (finding 1,296 regional jobs
significant); Gurule v. Astrue, No. 2:11CV96, 2012 WL 1609691,
at *5 (D. Vt. May 8, 2012) (finding 715,000 national jobs and
370 regional jobs significant); Haskins v. Comm'r of Soc. Sec.,
No. 5:05CV292(DNH), 2008 WL 5113781, at *11 (N.D.N.Y. Nov. 25,
2008) (finding 145,000 national and 1,050 regional jobs
significant).

Plaintiff also challenges the VE's testimony generally.
Plaintiff questions the methodology that the VE used to arrive

42

at the incidence numbers, and argues that rote recitation does not require expertise. As the ALJ noted, absent any "applicable regulation or decision ... requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation," Brault v. Soc. Sec. Admin., Com'r, 683 F.3d 443, 450 (2d Cir. 2012), "it is enough that a vocational expert identif[y] the sources he generally consulted to determine such figures[.]" Dugan v. Soc. Sec. Admin., Com'r, 501 F. App'x 24, 25 (2d Cir. 2012). See Tr. 29; see also McIntyre v. Colvin, 758 F.3d 146, 152 (2d Cir. 2014) ("[A] vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally." (citation omitted)).

Here, the VE testified that his data and figures were based on the Dictionary of Occupational Titles ("DOT"), and the "Specific Occupation Selection Manual," a U.S. Publishing publication that is based on Department of Labor data. Tr. 79. He testified that it was his practice to look at "how positions exist in today's marketplace and assign that to the best DOT that currently exists." Tr. 83. The ALJ found that the VE "offered reliable testimony," as he "identified the sources he

43

used in addition to his personal experience in determining the numbers." Tr. 29.[7]

The VE submitted his credentials, identified the sources he used to arrive at his conclusions, and fully explained his methodology. Indeed, the VE testified that in determining the incidence numbers, he referenced several publications and eliminated positions based on restrictions posed by the ALJ's hypothetical. The Court therefore finds that the ALJ reasonably relied on the VE's expertise. See Jones-Reid v. Astrue, 934 F. Supp. 2d 381, 407 (D. Conn. 2012) ("The VE utilized reliable statistical sources as well [as] personal knowledge and experience to develop the occupational projections provided. While the VE did not provide a step-by-step description of the methodology used, this Court cannot say that the ALJ erred in accepting the VE's testimony as reliable, as there was a sufficient basis for the ALJ to so find."), aff'd, 515 F. App'x 32 (2d Cir. 2013). Plaintiff was also given an opportunity to cross-examine the VE, and to provide supplemental briefing on the issue, which was considered by the ALJ. See Brault, 683 F.3d

---

[7] To the extent that plaintiff argues that the VE was unqualified, the Court refers the plaintiff to Mr. Maxim's resumé, which is part of the administrative record. See Tr. 575. Mr. Maxim's resumé reflects that he has served as a vocational consultant from 1998 to present, and has been working in positions involving human resources, job counseling and job placement for over 40 years. The Court therefore finds no merit to the argument that the VE did not have the qualifications to testify.

at 451 ("[Plaintiff's] attorney had a full opportunity to explain his objections [to the VE's testimony] in significant detail. Nothing more was required."). Accordingly, the ALJ's step five determination was supported by substantial evidence.

## VI.    CONCLUSION

For the reasons set forth herein, defendant's Motion to Affirm the Decision of the Commissioner **[Doc. #21]** is **GRANTED**, and that plaintiff's Motion to Reverse the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing **[Doc. #19]** is **DENIED**.

This is not a recommended ruling. The parties consented to proceed before a United State Magistrate Judge on August 12, 2016, [Doc. #14], with any appeal to be made directly to the Court of Appeals. See Fed. R. Civ. P. 73(b)-(c).

SO ORDERED at New Haven, Connecticut, this 20th day of July, 2017.

                          /s/
                  _____
                  HON. SARAH A. L. MERRIAM
                  UNITED STATES MAGISTRATE JUDGE